UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re:                                                    Chapter 11

Cincinnati Terrace Associates, LLC,                       Case No.


                                    Debtor.
--------------------------------------------------------------x

### DEBTOR'S DECLARATION
### <u>PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4</u>

        David Goldwasser declares the following under penalties of perjury pursuant to 28 U.S.C. § 1746:

        1.      My firm (FIA Capital Partners LLC) and I have been engaged by Cincinnati Terrace Associates, LLC (the "Debtor") to act as the Company's non-member manager and restructuring officer for purposes of pursuing the Debtor's debt restructuring efforts in connection with the commencement of this Chapter 11 case.

        2.      I specialize in business restructuring, bankruptcy, and litigation planning, including Chapter 11 reorganization, bankruptcy claims, tax liens, and rescue capital for distressed commercial real estate. I have over 20 years of litigation and crisis management experience and have appeared on behalf of debtors in over forty bankruptcy cases in the Southern and Eastern Districts of New York.

        3.      I respectfully submit this Declaration in accordance with Local Bankruptcy Rule 1007-4 in support of the Debtor's filing of a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

**Events Necessitating the Chapter 11 Filing**

4.     The Debtor is the owner of certain development property located at 15 West Sixth Street, Cincinnati, Ohio (the "Property") which is subject to foreclosure proceedings and Notice of Sale scheduled for June 9, 2021 at 11:00 a.m.

5.     The Debtor is filing this petition on an emergency basis to preserve its rights in the Property, which is believed to have significant equity.  The Chapter 11 has even greater urgency since the Debtor's rightful ownership of the Property was just recently sustained by the federal court in Ohio over the claims of a disputed prior buyer pursuant to Decision and Order dated June 7, 2021.  A copy of this Decision is attached hereto as Exhibit A", and provides background for the Chapter 11 filing.

6.     Unfortunately, however, the Debtor now finds itself victimized by an unscrupulous private lending group, known as TBG Funding LLC (the "Lender"), which has engaged in a number of suspect transactions relating to the origination of the mortgage loan, and is proceeding with a foreclosure, notwithstanding the recent ruling by the federal court.

7.     The Property was financed in or about 2018 under an unorthodox and complicated set of transactions involving an assignment agreement, master lease and option agreement.

8.     The Property is being developed as a retail center and is subject to a disputed first mortgage lien in the original principal sum of approximately $7 million

9.     Efforts to resolve the mortgage dispute have been unsuccessful. Accordingly, the Debtor is now seeking Chapter 11 relief to preserve the *status quo*, while the myriad of issues surrounding the Property are sorted out. At worst, the underlying mortgage debt can be refinanced once a fair and proper amount is established by the Bankruptcy Court.

**Local Rule 1007-4 Disclosures**

10.     Pursuant to Local Rule 1007-4 (a)(v), no committee of creditors was formed prior to the filing of the Petition.

11.     Pursuant to Local Rule 1007-2(a)(vi), a list of the Debtor's twenty largest creditors will be included as part of the Debtor's bankruptcy schedules to be filed shortly.

12.     Pursuant to Local Rule 1007-2(a)(vii), the Property is subject to a mortgage and various liens and judgments which will be itemized in the Debtor's bankruptcy schedules, to be filed shortly.

13.     Pursuant to Local Rule 1007-2(a)(viii), the Debtor's assets and liabilities will be set forth in the bankruptcy schedules to be filed shortly but are comprised principally of the Property.

14.     Pursuant to Local Rule 1007-2(a)(ix), the membership interests of the Debtor are held by the limited liability companies as noted in the accompanying resolution.

15.     Pursuant to Local Rule 1007-2(a)(x), a receiver has not been appointed with respect to the Property.

16.     Pursuant to Local Rule 1007-2(a)(xi), the Property Debtor has an approximate fair market value of more than $20.0 million.

17.     Pursuant to Local Rule 1007-2(a)(xii), the Debtor's books and records are located at its business offices in Brooklyn.

18.     Pursuant to Local Rule 1007-2(a)(xiii), the Debtor is subject to the pending foreclosure action instituted by the Lender in Hamilton County Ohio Circuit by the firm of Vorys, Sater, Seymour and Pease LLP, bearing Case number A 1905289.

19.    Pursuant to Local Rule 1007-2(a)(xiv), I am the current Manager and restructuring officer of the Debtor.

Dated: New York, New York
      June 9, 2021

                                        /s/ David Goldwasser        
                                        David Goldwasser, Manager

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Cincinnati Development III, LLC,

      Plaintiff,

v.

Cincinnati Terrace Plaza, LLC, et al.,

      Defendants.

Case No.  1:18-cv-00586

Judge Michael R. Barrett

## OPINION AND PARTIAL[1] ORDER

This matter came before the Court on a bench trial held from April 26, 2021 to April 29, 2021. Per the Court's request, and prior to the bench trial, the parties submitted Proposed Findings of Facts and Conclusions of Law. (Docs. 88, 89, 90, 91). Per the parties' request,[2] and after the close of evidence, they submitted written closing arguments. (Docs. 107, 108, 109, 110).

The Court must determine the contractual rights and obligations of Plaintiff Cincinnati Development III, LLC ("First Buyer"), Defendant Cincinnati Terrace Plaza, LLC ("Seller"), and Defendant Cincinnati Terrace Associates, LLC ("CTA" or "Second

---

[1] At the end of this matter, in addition to deciding the parties' specific claims, the Court will have made two general types of determinations: the contractual rights and obligations of the various parties and the appropriate award of damages. The Court takes judicial notice of both the state court foreclosure action regarding the real property at issue, *see* Court of Common Pleas for Hamilton County, Ohio, case number A 1905289, and the Sheriff of Hamilton County, Ohio's noticed public sale of that property which is scheduled to occur on June 9, 2021 at 11:00 A.M. In light of the date of that Sheriff's sale, the Court finds it necessary to bifurcate its Opinions and Orders on the contract and damages determinations. This Opinion and Order will address only the various parties' contractual rights and obligations. A separate Opinion and Order addressing the appropriate award of damages will issue on a later date.

[2] The Court notes Defendant Cincinnati Terrace Associates, LLC's request to proceed with oral closing arguments in lieu of written closing arguments. Consistent with the other parties, though, Cincinnati Terrace Associates, LLC submitted a written closing argument.

Buyer"[3]), as those rights and obligations relate to the real property located at 15 West Sixth Street Cincinnati, Ohio 45202 ("Property") in downtown Cincinnati.[4] The Property is the site of what was formerly known as the Terrace Plaza Hotel which was a hotel, office, and retail structure with historical and architectural significance to some, including individual admirers and preservation organizations alike. The Court sits as the finder of fact in a bench trial and is thus permitted to draw reasonable inferences from the credible testimony and exhibits adduced at trial. The Court has considered that evidence, along with the parties' pre- and post-trial submissions. What follows are the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I.    **FINDINGS OF FACT**[5]

### 1. The Parties

First Buyer is an Ohio LLC that Anthony Birkla controls. Mr. Birkla formed First Buyer for the purpose of acquiring the Property. Mr. Birkla operates primarily out of Indianapolis, Indiana, but has an office in Cincinnati.

Seller is a Delaware LLC that Harris Stasis and Roys Poyiadjis control. Seller purchased the Property in August 2016 by way of a foreclosure sale. Mr. Stasis operates out of the Republic of Cyprus.

---

[3] The Court will refer to the purchaser of the Property as Second Buyer for ease of reference. However, and as explained in more detail herein, Cincinnati Terrace Associates, LLC is a company that Cincinnati Terrace Member, LLC ("CTM") formed and purchased through the sale and purchase of membership interests.

[4] The legal description of the Property can be found on page 14 of JX 54.

[5] The labels and headings included in this Opinion and Partial Order are not controlling. *Cf. Cordovan Assoc., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6th Cir. 1961) (citing *Bogardus v. Comm'r of Internal Revenue*, 302 U.S. 34 (1937)). To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa. *Meyer v. Bank of Am., N.A.*, No. 2:18-CV-218, 2021 WL 868587, at *1 n.2 (S.D. Ohio Mar. 9, 2021).

Second Buyer is an Ohio LLC that CTM controls. Second Buyer and CTM were formed for the purpose of acquiring the Property. CTM is Second Buyer's sole member. CTM is run by Ezra Unger who operates out of Brooklyn, New York.

TBG Funding LLC ("Lender") is a Delaware LLC.

First Buyer, Seller, and Second Buyer each intended to form an LLC for the purpose of selling or acquiring the Property. In addition, the two contracts at issue each contemplated a sale of the Property structured by way of a contribution deed that would transfer the Property from Seller to a to-be-formed Ohio LLC and then Seller would transfer ownership of membership interests in that newly-formed-LLC to the respective contractual purchaser. This transaction structure would be exempt from certain Ohio transfer taxes.

First Buyer and Seller utilized the services of local commercial real estate agents and brokers from the Cincinnati office of Cushman & Wakefield ("C/W"). Don Murphy of C/W represented First Buyer in its efforts to purchase the Property. The C/W team of Michael Sullivan and James O'Connell were Seller's listing agents and worked to market and sell the Property pursuant to a September 2016 listing agreement. Second Buyer did not utilize local agents or brokers from Cincinnati. Instead, Second Buyer learned of the Property from a non-local man named Angelo Slabakis.

### 2. 2017 Purchase Agreement

The Cincinnati office of C/W initially brought the Property to Mr. Birkla's attention in the fall of 2016. At that time, Mr. Birkla was not interested in purchasing the Property due to other real estate development commitments in Cincinnati and Indianapolis.

Throughout the fall of 2016 and into 2017, and on Seller's behalf, C/W promoted and marketed the Property. By this time, and despite its past as one of the first modern luxury hotels in America, the Property had been mostly vacant for years except for a few street-level storefront retail businesses that remained on lease. The hotel and office space were dormant with the internal finishes and mechanical systems nearly ruined and the cause of City of Cincinnati ("City") building code violations. The physical structure itself was seriously deteriorating due to years of neglect and in need of immediate attention, also resulting in City building code violations. In short, the Property had become costly to maintain when Seller marketed it. Notwithstanding the Property's state, in early 2017, Mr. Birkla remained interested in purchasing it on behalf of First Buyer. Mr. Birkla determined that the Property was unique because of its disrepair. He described the building as almost like Play-Doh in that, with his extensive real estate development background and relationship and good-will with the City, his company could transform the building into something new and in a way that no other company could. And, of a handful of potential purchasers that made offers in the initial round, First Buyer's offer was the most appealing to Seller.

The negotiations between First Buyer and Seller culminated in a June 30, 2017 Membership Interest Purchase Agreement for the sale of the Property ("2017 Purchase Agreement") with a $12.5M purchase price. This agreement provided for a 75-day

Inspection Period and gave First Buyer the option to extend the Inspection Period by 30 days for a non-refundable payment of $15,000.00. This agreement had completed escrow terms and required First Buyer to deposit $150,000.00 in an account at Riverbend Commercial Title Agency Limited Partnership ("Riverbend") as earnest money within five business days after the agreement's effective date. First Buyer deposited its earnest money deposit pursuant to those terms.

The 2017 Purchase Agreement contemplated a sale of the Property structured such that, no earlier than three days prior to the closing date, First Buyer would, with Seller's involvement and consent, form a new Ohio LLC in which Seller would be the sole member; one day prior to the date of closing, Seller would convey the Property into the newly-formed LLC by way of a limited warranty deed; and, on the date of closing, Seller would sell 100% of its membership interests in the newly-formed LLC to First Buyer. Stated otherwise, Seller would sell, and First Buyer would buy, membership interests in the newly-formed LLC that held the deed to and owned the Property. This transaction structure would be exempt from certain Ohio transfer taxes.

In Mr. Birkla's mind, to make the $12.5M purchase price workable for such a run-down building, First Buyer would need to obtain various tax options and incentives from the City. During the 75-day Inspection Period, and, in addition to other due diligence, First Buyer explored the support for the project by meeting with various City officials, business leaders, other real estate development companies, and various banks. After its due diligence, First Buyer did not extend the Inspection Period, in large part, because of its conclusion that the $12.5M purchase price and valuation was overvalued.

In September 2017, First Buyer gave timely written notice to Seller that it was terminating the 2017 Purchase Agreement. In that notice, First Buyer's counsel, Barrett Tullis of Keating Muething & Klekamp ("KMK"), informed Seller that First Buyer elected not proceed with the 2017 Purchase Agreement but, despite this termination, remained interested. To that end, in the same notice, First Buyer queried whether Seller would alternatively agree to an extension of the Inspection Period on terms found in an attached proposed Second Amendment to the 2017 Membership Purchase Agreement. Seller did not accept First Buyer's proposal and the 2017 Purchase Agreement expired. Later, and per Seller's instructions, Riverbend returned First Buyer's earnest money deposit in December 2017.

### 3. 2018 Purchase Agreement

From September 2017 to May 2018, First Buyer continued to communicate its interest in acquiring the Property to Seller. In addition to a January 2018 $8.5M all-cash offer that Seller declined, and an April 2018 $9M offer that Seller declined, the parties, and their respective C/W agents, continued to negotiate. They eventually entered into another Membership Interest Purchase Agreement for the sale of the Property ("2018 Purchase Agreement"), this time with a June 1, 2018 effective date[6] and $9.5M purchase price.

When the parties entered the 2018 Purchase Agreement, Seller continued to be represented by Michael Galasso[7] of Robbins, Kelly, Patterson & Tucker, and First Buyer was in the process of switching legal representation from Mr. Tullis of KMK to new counsel

---

[6] First Buyer and Seller agreed to amend the effective date of the 2018 Purchase Agreement from May 23, 2018 to June 1, 2018 due to a delay in signing on Seller's behalf.

[7] Mr. Galasso served as Seller's primary point of contact with First Buyer throughout their negotiations.

from Graydon Head & Ritchey ("Graydon"). Thus, at the time First Buyer signed this agreement, First Buyer did not have legal representation. Mr. Galasso, along with real estate attorneys from his firm, reworked the 2017 Purchase Agreement, that Mr. Tullis had drafted, to create the 2018 Purchase Agreement.

The 2018 Purchase Agreement also contemplated a sale of the Property structured such that, no earlier than three days prior to the closing date, First Buyer would, with Seller's involvement and consent, form a new Ohio LLC in which Seller would be the sole member; one day prior to the date of closing, Seller would convey the Property into the newly-formed LLC by way of a limited warranty deed; and, on the date of closing, Seller would sell 100% of its membership interests in the newly-formed LLC to First Buyer. This transaction structure continued to be exempt from Ohio transfer taxes.

The $9.5M purchase price was to be paid by a combination of an earnest money deposit and wire transfer of the balance at the closing. Section 2(c) of the 2018 Purchase Agreement, which provides for an earnest money deposit of $150,000.00, was incomplete at the time of execution. It reads:

> Within five business days after the Effective Date of this Agreement Purchaser shall deposit $150,000 ("Earnest Money") into an escrow account titled jointly in the names of Michael A. Galasso (Seller's counsel) and _____ (Purchaser's counsel). Seller's counsel and Purchaser's counsel shall collectively serve and be referred to herein as "Escrow Agent." The signature of both Seller's counsel and Buyer's counsel shall be required for all withdrawals from the escrow account. The escrow account shall be opened and held at Huntington National Bank, or such other bank as Seller's counsel and Buyer's counsel may agree.

The signature on the 2018 Purchase Agreement for the collective "Escrow Agent" similarly contains only Mr. Galasso's signature. Again, at the time that First Buyer executed this agreement, First Buyer was in the process of obtaining new counsel. For

that reason, First Buyer did not insert the name of its legal counsel in either of the above-described two blanks in the agreement.

The 2018 Purchase Agreement provides for a 60-day Inspection Period. During the Inspection Period, First Buyer could terminate the contract and get back the earnest money deposit. After the Inspection Period expired, the earnest money deposit would become non-refundable, *i.e.,* "go hard,"  and be applied to the purchase price at closing. Unlike the 2017 Purchase Agreement, the 2018 Purchase Agreement did not give First Buyer the option to extend the Inspection Period.

The 2018 Purchase Agreement provides for a closing within 30 days after the expiration of the Inspection Period. Section 11 of the agreement, titled "Failure to Close," states that, in the event that the parties failed to close on the Property due to Seller's breach, First Buyer, at its option, may *either* elect to enforce the terms of the 2018 Purchase Agreement by action for specific performance, and/or exercise any other right or remedy available to it at law or in equity *or* terminate the agreement by notice to Seller and receive a refund of the earnest money plus reimbursement from Seller not to exceed $50,000.00.

The 2018 Purchase Agreement permits Seller to continue to market the Property as for sale until the closing has occurred. At the same time, and unlike the 2017 Purchase Agreement, the 2018 Purchase Agreement includes an Agreement Granting Right of First Refusal ("ROFR"). Pursuant to the ROFR, if Seller agrees to sell the Property to a third-party before the expiration of the Inspection Period, Seller has an obligation to provide notice of the closing to First Buyer. First Buyer would then have to purchase the Property by matching the third-party's terms and conditions, including purchase price, provided

that the matching funds are paid prior to third-party's scheduled closing. If First Buyer does not so match, First Buyer's ROFR terminates and Seller may terminate the contract and must pay $100,000.00[8] to First Buyer. The ROFR states that that this $100,000.00 termination fee shall be First Buyer's sole remedy as liquidated damages for Seller's failure to perform.

At the time of its effective date, the 2018 Purchase Agreement was a valid, enforceable contract and includes a valid enforceable ROFR. However, First Buyer did not deposit its earnest money within five business days after the 2018 Purchase Agreement's effective date or at any time during the 2018 Purchase Agreement's Inspection Period. First Buyer never inserted the name of its legal counsel in whose name the escrow account was to be jointly titled with Mr. Galasso. First Buyer and Seller never jointly open an escrow account at Huntington National Bank or any other agreed-upon bank.

First Buyer did not complete its due diligence during the 2018 Purchase Agreement's 60-day Inspection Period. From the outset of the negotiations vis-à-vis the 2018 Purchase Agreement, and due to a combination of the Property's decline and Mr. Birkla's intent to limit his risk, First Buyer made it clear to Seller that, unless First Buyer received a tax incentive package from the City, it would not be willing to close the purchase of the Property. One piece of First Buyer's desired tax incentive package was tax increment financing ("TIF"). If First Buyer obtained the TIF, pursuant to Ohio law, the Property would have to be temporarily transferred to the City to hold to utilize the TIF. Stated differently, the TIF piece of First Buyer's desired tax incentive package would

---

[8] The $100,000.00 termination fee was included to cover the expenses that First Buyer would incur performing its due diligence and working to secure incentives from the City.

necessarily involve a temporary transfer of the Property from First Buyer to the City and a later transfer from the City back to First Buyer. In light of the possibility of the City having to own the deteriorating building, the City gave First Buyer push-back that resulted in delays due to the timing of certain City meetings required for TIF approval.

First Buyer began requesting extensions of the 2018 Purchase Agreement's Inspection Period almost immediately after execution of that agreement as a result of the delay by the City. Seller neither entered into an amended agreement nor approved any extension of the 2018 Purchase Agreement's Inspection Period.

### 4.  Second Buyer Contract

Second Buyer became interested in purchasing the Property in late January 2018. At that time, Mr. Unger became aware of Seller's desire to sell it through Mr. Slabakis when the two were introduced at a convention in Florida. Mr. Slabakis is not a party to this litigation and formerly co-owned the Property, prior to it being foreclosed upon by a company operated by Mr. Stasis and Mr. Poyiadjis.[9] Mr. Unger met with Mr. Slabakis in New York later in January 2018 to discuss the Property further. Mr. Unger determined that purchasing the Property would be a good investment in light of Cincinnati's rising popularity as a tourist destination, the building's historical significance, the availability of City and federal financial incentives, and the likely purchase price that he could obtain. Mr. Unger envisioned building a hotel that Cincinnatians would be proud of.

In February 2018, one of Mr. Slabakis's attorneys formed two LLCs—Second Buyer and CTM—with the Ohio Secretary of State.

---

[9] No party offered the testimony of Mr. Slabakis, Mr. Poyiadjis, or Mr. Slabakis's transactional attorney, Anthony Simari, in this matter.

Prior to entering into a contract to purchase the Property, Second Buyer performed routine due diligence, including obtaining an appraisal, various studies regarding residential use, hospitality use, and tax credits, and sent an agent, Moshe Pinsky, to visit the Property. On May 16, 2018, Mr. O'Connell received a phone call from Mr. Galasso explaining that an individual was trying to tour the Property and needed to be let in. Mr. O'Connell, Mr. Sullivan, and Mr. Murphy did not know anything about a tour of the Property scheduled for that day but, as the listing agent, Mr. O'Connell typically provided access to the Property. Mr. O'Connell went to the Property to meet the individual requesting access. That person was Mr. Pinsky, who told Mr. O'Connell that his company was interested in purchasing the building. In response, and in light of C/W's interests with First Buyer and Seller, Mr. O'Connell told Mr. Pinsky that the Property was under contract with someone else, although Mr. O'Connell did not tell Mr. Pinsky with whom Seller had an alleged contract. Mr. O'Connell's response to Mr. Pinsky was incorrect as, at that time, the Property was not under contract. Mr. O'Connell did not follow up with Mr. Pinsky about his company's interest in acquiring the Property.

In the meantime, Mr. Unger's transactional attorney, Stephen Friedman, and Mr. Slabakis's transactional attorney, Anthony Simari, began negotiating a contract to purchase the Property with Seller's New York counsel, James Smith.[10] Throughout the contract negotiations and discussions up to closing, Mr. Unger communicated almost exclusively with Mr. Friedman, and Mr. Friedman almost exclusively communicated with Seller by going through Mr. Simari who, in turn, obtained information from Mr. Smith. Mr. Friedman explained that Mr. Simari was already in discussions with Mr. Smith by the

_____

[10] Mr. Smith's declaration is in the record and he did not testify at the bench trial.

time that Mr. Unger got involved with the Property, so it was easier if Mr. Simari maintained the communication lead on behalf of Second Buyer, *i.e.*, Mr. Unger and Mr. Slabakis.[11] On May 24, 2018, Mr. Smith sent Mr. Simari a draft Membership Interest Purchase Agreement with exhibits. Mr. Simari forwarded that draft to Mr. Friedman.

Turning back to First Buyer and Seller, on June 12, 2018, Mr. Galasso emailed Brian Fox, one of First Buyer's new attorneys with Graydon, a copy of the expired 2017 Purchase Agreement. Mr. Galasso provided this document per Mr. Fox's request and in furtherance of finalizing the 2018 Purchase Agreement's escrow terms and exhibits.

Turning back to Second Buyer, on June 13, 2018, Second Buyer and Seller executed a Membership Interest Purchase Agreement for the sale of the Property ("Second Buyer Contract") with a June 12, 2018 effective date. The Second Buyer Contract is similar in some respects to the 2018 Purchase Agreement between First Buyer and Seller, and also contains a few important differences. Starting with the differences, the purchase price is $11M and includes a $250,000.00 non-refundable deposit, which is clearly more favorable to Seller than First Buyer's $9.5M purchase price with a refundable earnest money deposit. Further, the Second Buyer Contract does not contain an Inspection Period and provides for a closing within 45 days of the effective date of that agreement. Additionally, that section of the Second Buyer Contract discussing existing leases represents that no person, firm, corporation or other entity has any right

---

[11] Ultimately, Mr. Slabakis obtained 20% of Second Buyer and Mr. Unger retained 80% of Second Buyer. Mr. Unger explained that Mr. Slabakis obtained this percentage because Mr. Slabakis helped negotiate a below market deal for the Property.

or options to acquire the premises, any portion thereof or any interest therein, and that this representation survives the closing for 6 months.

With respect to important similarities between the Second Buyer Contract and the 2018 Purchase Agreement, both contemplated a sale of the Property structured by way of contribution deed. Both contained the following representations and warranties by Seller:

- At closing, Seller will transfer the Property to Second Buyer free and clear of any rights of first refusal and options;

- The consummation of the transaction will not conflict with or result in a breach of any agreement to which Seller is a party; and

- There are no purchase contracts, options, or any other agreements of any kind, oral or written, formal or informal, choate or inchoate, recorded or unrecorded, whereby any person or entity other than Seller will have acquired or will have any basis to assert any right, title, or interest in, or right to possession, use or enjoyment or proceeds of, any part or all of the Property.

Second Buyer paid Seller the $250,000.00 non-refundable deposit on June 13, 2018.

The Court finds that Second Buyer Contract is a valid and enforceable contract.

### 5.  June 14, 2018 through August 1, 2018

Seller continued to negotiate with First Buyer in Cincinnati through Mr. Galasso and with Second Buyer in New York through Mr. Smith. Mr. Smith declared that he did not disclose the existence of the 2018 Purchase Agreement to Second Buyer, or any of its attorneys or agents. Mr. Galasso testified that, although he knew that Mr. Smith had been talking to a "New York group" about the Property for quite some time, Mr. Galasso was not aware that Mr. Smith had successfully negotiated the Second Buyer Contract until after it was executed. Mr. Galasso acknowledged, however, that almost immediately

after Second Buyer and Seller executed the Second Buyer Contract, Mr. Smith informed Mr. Galasso about it. As discussed in more detail below, from June 13, 2018 through early August 2018, Mr. Galasso chose to withhold notice of the Second Buyer Contract from First Buyer despite the notice requirement in the ROFR, and Mr. Galasso, aware of the Second Buyer Contract and the representations and warranties therein, chose not to inform Second Buyer of the existence of the 2018 Purchase Agreement and ROFR.

On June 14, 2018, the day after the Second Buyer Contract's execution, Mr. Galasso notified Mr. Fox that Mr. Galasso had Seller's approval to change the 2018 Purchase Agreement's effective date from June 1, 2018 to June 11, 2018. Mr. Galasso asked if Mr. Fox wanted to discuss that possible change at the same time that they discussed finalizing the exhibits to 2018 Purchase Agreement. Again, at this time, Mr. Galasso did not inform First Buyer of the Second Buyer Contract.

On June 23, 2018, while Second Buyer was conducting its due diligence on the Property, one of Second Buyer's agents, Menashe Oved, came across an old news article indicating that Mr. Birkla had been in contract to purchase the Property. Mr. Oved forwarded this information to Mr. Unger and two other agents for Second Buyer, Mr. Pinsky and Abe Ziegerman, to share his findings regarding the Property's background with Second Buyer's team. There was no indication in Mr. Oved's June 23, 2018 email that Mr. Birkla was, as of June 23, 2018, under contract to purchase the Property. To Mr. Unger, Mr. Oved's research simply indicated that the City had concerns about Mr. Birkla's prior possible acquisition of the Property because Mr. Birkla's plans would not maintain the Property's historical significance.

On July 9, 2018, Second Buyer received a title report that indicated that the Property was unencumbered. As neither First Buyer nor Seller had recorded the 2018 Purchase Agreement, there was no indication in that title report that First Buyer had any interest, claim to, or contract right in the Property. The title report showed only taxes due and filings in an appeal of building code violations for the Property. Moreover, nothing in the available docket for that building code action referenced a potential sale of the Property.

Also on July 9, 2018, Monica Kohnen, another one of First Buyer's new attorneys with Graydon, emailed Mr. Galasso requesting that Seller review two documents: a revised version of the 2018 Purchase Agreement and a Blackline document indicating the differences between the 2018 Purchase Agreement and the revised version. The revised version included a June 11, 2018 effective date; an agreement that First Buyer would deposit earnest money into an escrow account with Commonwealth Land Title Insurance Company ("Commonwealth"); a statement that Commonwealth would serve as the Escrow Agent;[12] and completed exhibits.[13] Ms. Kohnen testified that, although her firm did not represent First Buyer when it executed the 2018 Purchase Agreement, shortly thereafter, her firm was engaged to get First Buyer through due diligence and to closing. She explained that her July 9, 2018 email to Mr. Galasso was part of her attempt to close the deal, because someone had to draft the documents and Mr. Galasso had not yet done

---

[12] Ms. Kohnen explained that the 2018 Purchase Agreement's provision calling for a collective "Escrow Agent," comprised of Mr. Galasso for Seller and the yet-to-be-filled-in legal counsel for First Buyer was not typical and, usually, the parties would have a title company to serve as the escrow agent to avoid conflicts and as the title company would keep the escrow money.

[13] Mr. O'Connell and Ms. Kohnen each explained that it was typical for these types of agreements to have incomplete exhibits at the agreement's execution and that the parties would usually work together so that the exhibits were finalized by closing.

so. Mr. Galasso never responded to Ms. Kohnen's July 9, 2018 email and neither Ms. Kohnen nor anyone from her firm followed up with Mr. Galasso about this particular email. The parties did not enter into the revised version.

On July 11, 2018, Mr. Galasso emailed several documents relating to the Property—including a prior foreclosure decree, a receivership order, a real estate tax bill, and an Owner's Policy of Title Insurance—to Ms. Kohnen, as First Buyer's title company requested those documents.

Just as before, there is no indication that Mr. Galasso informed First Buyer of the Second Buyer Contract in response to Ms. Kohnen's July 9, 2019 email or when transmitting the requested documentation to her two days later.

On July 17, 2018, Mr. Birkla requested a meeting with Mr. Galasso and Seller's listing agents. Mr. Birkla wanted to meet to provide an update on First Buyer's due diligence and because he was scheduled to appear before the City Planning Commission on July 20, 2018, in furtherance of his attempt to secure the TIF. Mr. Birkla wanted to ensure that First Buyer and Seller remained under contract before he represented as such to the City Planning Commission.

On July 18, 2018, Mr. Birkla met with Mr. Galasso, along with Mr. Sullivan for Seller and Mr. Murphy for First Buyer. Mr. Birkla pressed Mr. Galasso as to Seller's commitment to First Buyer and, in response, Mr. Galasso assured Mr. Birkla that the two parties were under contract. Mr. Birkla also stated First Buyer's need for an extension of the 2018 Purchase Agreement's Inspection Period to complete due diligence, including more time to review title, get a survey needed by a lender, and secure City incentives to make the project viable for First Buyer. Seller did not accept this request. Mr. Galasso testified

that he was absolutely aware of the existence of the Second Buyer Contract as of July 18, 2018. Mr. Galasso chose not to advise Mr. Birkla, or any of the C/W representatives, of the Second Buyer Contract at this meeting. At the end of the meeting, Mr. Birkla asked Mr. Galasso if Seller had First Buyer's earnest money deposit, Mr. Galasso responded that Seller did not, and Mr. Birkla instructed Mr. Murphy to look into that issue.

Later in the day on July 18, 2018, the Cincinnati Business Courier published an article entitled "EXCLUSIVE: A crucial step for $61 million redevelopment of Terrace Plaza" ("CBC Article"). The CBC Article discussed Mr. Birkla's scheduled appearance before the City Planning Commission for a hearing on First Buyer's desired City incentive package. The last paragraph of the CBC Article stated that "Anderson Birkla continues to have the Terrace Plaza under contract."

On July 19, 2018, Mr. Oved obtained a copy of the CBC Article. Mr. Oved forwarded it to Messrs. Friedman, Unger, Zeigerman, and Pinsky, and asked Mr. Friedman whether he had any information from Seller on the statements made in therein about Mr. Birkla's contract. Mr. Friedman emailed Mr. Simari requesting information. In response, Mr. Simari informed Mr. Friedman that any deal with Mr. Birkla appeared to be a backup offer and that Second Buyer beat Mr. Birkla to the table. Mr. Friedman, in turn, informed Messrs. Oved, Unger, Zeigerman, and Pinsky that the CBC Article was inaccurate. Mr. Friedman testified that, based on Mr. Simari's response, in conjunction with Seller's representations and warranties in the Second Buyer Contract, and Mr. Friedman's experience as a transactional real estate attorney that there were always people vying for a property and making noise, at no point did Mr. Friedman believe that anyone other than Second Buyer had the Property under contract.

On July 20, 2018, Mr. Birkla gave First Buyer's presentation to the City Planning Commission and the City Planning Commission unanimously voted to move First Buyer's TIF proposal forward.

On July 24, 2018, Mr. Galasso received more updates on First Buyer's due diligence efforts from C/W via email. That email informed Mr. Galasso that Mr. Birkla was successful in front of the Cincinnati Planning Commission and was scheduled to appear before the City's Community & Economic Development Committee the following week to seek approval of the TIF. The email also stated that, if the Community & Economic Development Committee approved the TIF, City Council would also need to approve it, and City Council was not scheduled to meet until September 2018. Thus, in the same email, Mr. Murphy requested that Seller mull over an extension of the 2018 Purchase Agreement to allow sufficient time for Mr. Birkla to obtain those City approvals.

On July 27, 2018, the contractual closing date—*i.e.*, 45-days after the Second Buyer Contract's effective date—Mr. Simari, on behalf of Second Buyer, notified Mr. Smith, Seller's New York counsel, that Second Buyer's financing was in place. On that date, the parties agreed to "adjourn the closing to August 1, 2018 Time of the Essence." Mr. Friedman testified that the final date of closing was pushed to August 1, 2018 due to the parties' failure to have all necessary paperwork in place as of July 27, 2018. Seller never gave First Buyer notice of this closing.

On July 29, 2018, Mr. Galasso emailed Ms. Kohnen stating that he wanted to confirm how long of an extension of the 2018 Purchase Agreement's Inspection Period First Buyer was asking for, as the information that he received from her in the July 9, 2018 email and from Mr. Murphy in the July 24, 2018 email were inconsistent.

On July 30, 2018, Seller transferred to CTM all rights, title, and interest in its membership interests in CTA through an Assignment of Membership Interest. On August 1, 2018, Seller delivered the deed[14] to the Property, dated July 30, 2018, to Second Buyer. The sale price of the Property was $10.4M.[15] Upon delivery of the deed, the Property became Second Buyer's only asset.

There is no evidence that Second Buyer had knowledge of the 2018 Purchase Agreement and ROFR as of the July 27, 2018 start of closing or the August 1, 2018 completion of closing. There is no evidence that Second Buyer and Seller deceitfully delayed the date of their closing.

To finance the purchase of the Property, Second Buyer borrowed $7M from Lender. Lender was heavily involved in Second Buyer's closing and required that Second Buyer enter into a number of different agreements to finance the transaction, *e.g.*, an Assignment & Assumption Agreement, Master Lease Agreement, and Assignment of Membership Interest Agreement. Prior to loaning Second Buyer the $7M, Lender conducted its own due diligence, including conducting a title search of the Property. On August 1, 2018, Lender obtained an updated title commitment policy that did not contain any reference to First Buyer.

Second Buyer entered into a promissory note ("Note"), effective August 1, 2018, in favor of Lender for the principal amount of $7M. Second Buyer granted a mortgage ("Mortgage") to Lender effective August 1, 2018. In the Mortgage, Second Buyer

---

[14] Mr. Smith executed the deed for Seller and Mr. Galasso's firm prepared the deed.

[15] The August 1, 2018 settlement statement, which Mr. Galasso signed, reveals that Second Buyer paid the sale price partially in cash and partially through a mortgage loan secured from Lender. Additionally, Seller paid a $600,000.00 concession to Second Buyer on Mr. Slabakis's behalf, and this concession is memorialized in the settlement statement.

warranted to Lender that Second Buyer held good and marketable title free and clear of all liens and encumbrances. Second Buyer granted an assignment of rents ("Assignment of Rents") to Lender effective August 1, 2018.

Also on August 1, 2018, Mr. Pinsky called Mr. O'Connell and informed him that Second Buyer purchased the Property and inquired about obtaining the contact information for the Property's C/W property manager, as Second Buyer wanted to keep the property manager in place when Second Buyer began construction. Once again, Mr. O'Connell did not believe Mr. Pinsky and immediately called Mr. Galasso. Mr. Galasso subsequently confirmed that Seller sold the Property to Second Buyer.[16]

### 6.  August 2, 2018 to the present

Mr. Birkla first learned of the sale of the Property on an August 3, 2018 phone call. He initially thought it was a joke, but quickly realized that Seller had, in fact, sold the Property to Second Buyer. Mr. Birkla had never heard of Mr. Unger until that phone call. That same day, First Buyer made a deposit of $150,000.00 into an escrow account maintained by Commonwealth.

On August 7, 2018, First Buyer initiated this lawsuit against Seller in the Court of Common Pleas for Hamilton County, Ohio. That same day, and despite the fact that First Buyer had obtained a Temporary Restraining Order ("TRO") enjoining the recording of the deed for at least 14 days, the deed for the Property was recorded.

_____

[16] Mr. Sullivan and Mr. O'Connell were shocked about the sale, as they had never heard of the Second Buyer Contract. In light of the sale to Second Buyer, that was essentially negotiated by Mr. Slabakis, Mr. Sullivan and Mr. O'Connell did not receive any commission fees for the sale of Property that they had been working on, under their listing agreement, for Seller for nearly two years.

Mr. Unger testified that, although Mr. O'Connell's negative attitude towards Mr. Pinsky on the August 1, 2018 call was a red flag that something was wrong, Second Buyer first learned of the 2018 Purchase Agreement when the state court issued the TRO.

On August 9, 2018, Seller, through Mr. Galasso, sent First Buyer, addressed to Mr. Birkla, a termination letter regarding the 2018 Purchase Agreement. It reads:

> Our firm represents Cincinnati Terrace Plaza, LLC. Reference is made to the Membership Interest Purchase Agreement dated June 1, 2018 between Cincinnati Terrace Plaza, LLC and Cincinnati Development III, LLC and to the Agreement Granting Right of First Refusal and Right to Terminate ("Agreement") of between [sic] Cincinnati Terrace Plaza, LLC and Cincinnati Development III, LLC.
>
> The "Inspection Period" under the Membership Interest Purchase Agreement expired on June 30, 2018 [sic]. Subsequent to the expiration of the Inspection Property [sic], the above referenced property was conveyed to a third-party on August 1, 2018. It is our understanding that suit has been initiated by Cincinnati Development III, LLC in which it takes the position that the Inspection Period does not expire until August 10, 2018. To the extent such Inspection Period is determined to be August 10, 2018, this correspondence shall serve as written notice of termination pursuant to Paragraph 3 of the Agreement.[17]

On August 10, 2018, First Buyer filed an Amended Complaint to include Second Buyer as a defendant and obtained an amended TRO. On August 17, 2018, Seller and Second Buyer removed the matter to this Court. That same day, the Mortgage and Assignment of Rents were recorded in the Hamilton County Recorder's Office.

On December 26, 2018, First Buyer filed an Affidavit of Facts Relating to Title with the Hamilton County Recorder's Office, which is recorded at Book 13821, Page 01560.

Second Buyer defaulted on the Note, Mortgage, and Assignment of Rents. Consequently, on November 5, 2019, Lender initiated a foreclosure action in the Court of Common Pleas for Hamilton County, Ohio, case number A 1905289, to obtain judgment

---

[17] Seller did not, within ten day or otherwise, pay First Buyer any $100,000.00 termination fee.

on the Note and to foreclose on the Mortgage and Assignment of Rents.

On October 14, 2020, Magistrate Berding issued a decision in the foreclosure action finding that Second Buyer defaulted on the Note, that the Mortgage was a valid and subsisting first and best lien on the Property, that the Assignment of Rents is a valid and subsisting first and best lien on the Property, that, as of May 20, 2020, Second Buyer owes Lender the principal balance of $7,000,000.00, plus accrued but unpaid interest in the amount of $70,000.00, default interest in the amount of $1,488,666.67, plus accruing interest, and that Lender is entitled to foreclose on the Property. On April 13, 2021, Judge Goering issued a Judgment and Order that adopted Magistrate Berding's decision and overruled Second Buyer's objections thereto.

### 7.  Summary

Second Buyer was not aware of the 2018 Purchase Agreement and ROFR from the time it entered into the Second Buyer Contract until after the August 1, 2018 completion of closing. Second Buyer reasonably relied on Seller's representations and warranties that the Property was not encumbered.

Seller had concerns about First Buyer's willingness to close on the Property under the 2018 Purchase Agreement, as First Buyer terminated the 2017 Purchase Agreement and requested extensions of the 2018 Purchase Agreement's Inspection Period. Seller wanted to sell the Property as fast as possible for the highest price, as most owners of a crumbling, high-rise would want to do. Seller never demanded that First Buyer complete the 2018 Purchase Agreement's escrow terms or deposit the earnest money in a specific escrow account.

Mr. Galasso implied that there was a history of Mr. Slabakis proposing deals to

Seller and those deals falling apart. Mr. Galasso told the Court that Mr. Slabakis's deals *never* close. So, although Mr. Galasso knew about the Second Buyer Contract almost immediately after its execution, he did not think it would actually close because Mr. Slabakis was involved.

First Buyer requested the extensions of the 2018 Purchase Agreement's Inspection Period to obtain City incentives that would minimize Mr. Birkla's financial risk, as most developers dealing with a multi-million dollar acquisition and development of a building that was, quite literally, falling apart, would do. First Buyer was reluctant to put hard money down until it had a clear read on the City's intentions regarding the incentive package. First Buyer sought extensions of the 2018 Purchase Agreement's Inspection Period, and did not seek an extended or conditional closing based on the City's timing. This type of requested extension is important, as it would postpone the payment of the earnest money that was to go hard at the close of the Inspection Period.

Therefore, the Court is convinced that, if given the ROFR, First Buyer would not have matched the $11M purchase price and non-refundable $250,000.00 deposit. However, that hypothetical conviction is irrelevant, as Mr. Galasso's knowledge of the Second Buyer Contract triggered Seller's obligation to inform First Buyer of the Second Buyer Contract so that First Buyer could exercise its options under the ROFR.

Seller entered into both the 2018 Purchase Agreement and Second Buyer Contract. Seller was aware that First Buyer had previously walked away from the 2017 Purchase Agreement's $12M purchase price, Second Buyer's $11M purchase price was well-above First Buyer's $9.5M purchase price, and First Buyer had not paid its $150,000.00 earnest money. Seller had two choices: honor the ROFR or violate the

ROFR.

With respect to honoring the ROFR, as it was highly unlikely that First Buyer would match the $11M price and non-refundable $250,000.00 deposit, **why not just inform First Buyer of the Second Buyer Contract per the ROFR?** The Court finds that the answer is, if Second Buyer did not close, as Mr. Galasso testified was typical of Mr. Slabakis's deals, and First Buyer had already walked from the ROFR, then Seller would lose both purchasers and risk another likely price reduction in order to get Mr. Birkla back to the table.

With respect to violating the ROFR, there were two possible options for Seller. First option: if Second Buyer did not close, then Seller could continue to negotiate with First Buyer about the 2018 Purchase Agreement with the $9.5M purchase price. Second option: if Second Buyer actually closed, then Seller would receive $11M and risk being sued by First Buyer under the ROFR. Seller chose the second option as a calculated, contractual risk because the Property was, and is, rapidly deteriorating and Seller did not want to be stuck with it any longer. Seller gambled that a court would rule in its favor by finding that First Buyer's non-payment of the earnest money would invalidate the 2018 Purchase Agreement.

Seller's gamble was wrong. At the time of its effective date, the 2018 Purchase Agreement was a valid, enforceable contract and First Buyer's non-payment of the earnest money does not invalidate that contract. Seller's bad faith violation of the ROFR, and the manner in which Seller continually mislead First Buyer, constitutes bad faith dealing.

## II.  <u>CONCLUSIONS OF LAW</u>[18]

### 1.  Seller breached the 2018 Purchase Agreement and ROFR

In Ohio,[19] to establish a breach of contract claim, a plaintiff must show: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Thomas v. Publishers Clearing House, Inc.*, 29 F. App'x 319, 322 (6th Cir. 2002) (citing *Doner v. Snapp*, 98 Ohio App.3d 597, 649 N.E.2d 42, 44 (1994)).

### i.  The 2018 Purchase Agreement is a valid, enforceable contract, and First Buyer's earnest money deposit is not a condition precedent thereto

"[A] condition precedent is one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, after the terms of the contract have been agreed on, before the contract shall be binding on the parties." *Mumaw v. W. & S. Life Ins. Co.*, 97 Ohio St. 1, 11, 119 N.E. 132, 135 (1917). At the summary judgment stage, Seller agreed with First Buyer that First Buyer's deposit of the earnest money in an escrow account was not a condition precedent to the 2018 Purchase Agreement. The Court agrees with the position advanced at the summary judgment stage: First Buyer's deposit of the earnest money is not a condition precedent to the 2018 Purchase Agreement. *Cf. Mumaw*, 119 N.E. at 135. At the time of its effective date, that agreement was a valid, enforceable contract and included a valid, enforceable ROFR.

---

[18] Though not contested, the Court has jurisdiction over this matter and venue is proper. *See* 28 U.S.C. §§ 1332, 1391(b)(2).

[19] Section 16 of the 2018 Purchase Agreement provides that Ohio law governs the agreement. The parties, and the Court, agree.

### ii. First Buyer did not repudiate the contract. First Buyer substantially performed thereunder, and its failure to pay the earnest money was not a material breach

"An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived." *Metz v. Am. Elec. Power Co.*, 2007-Ohio-3520, ¶ 35, 172 Ohio App. 3d 800, 809, 877 N.E.2d 316, 323. "A mere request for a change in terms . . . does not constitute a repudiation." *Haman Ents., Inc. v. Sharper Impressions Painting Co.*, 2015-Ohio-4967, ¶ 23, 50 N.E.3d 924, 930; *accord Farmers Comm. Co. v. Burks*, 130 Ohio App.3d 158, 172, 719 N.E.2d 980 (3d Dist. 1998) ("mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiation of a contract.").

A breach of one of several terms in a contract does not discharge the parties' obligations under the contract unless performance of that term is essential to the purpose of the agreement. *Hansel v. Creative Concrete & Masonry Constr. Co.*, 2002-Ohio-198, ¶ 11, 148 Ohio App. 3d 53, 56, 772 N.E.2d 138, 140-41. Indeed, for the doctrine of substantial performance to apply, the term unperformed must not destroy the value or purpose of the contract. *Id.* ¶ 12. Default by a party who has substantially performed does not relieve the other party from performance. *Id.*; *accord Blenheim Homes, Inc. v. Mathews,* 119 Ohio App. 44, 48, 196 N.E.2d 612, 614 (1963) ("Simple contract law has always distinguished between a material breach and an immaterial breach. A man may breach his contract but that does not necessarily void the contract or excuse performance by the other. If the breach is immaterial, the contract is still enforceable although subject to damages.").

Although First Buyer requested extensions of the 2018 Purchase Agreement's Inspection Period, those requests do not constitute an anticipatory breach of the 2018 Purchase Agreement. *See Haman Ents., Inc.*, 2015-Ohio-4967, ¶ 23.

First Buyer's failure to pay the earnest money did not destroy the purpose or value of the 2018 Purchase Agreement. *See Hansel*, 2002-Ohio-198, ¶ 12. The purpose of that contract was to transfer control of the Property in exchange for $9.5M. Per Section 4 of that contract, the earnest money was scheduled to "go hard" on August 1, 2018. First Buyer remained bound to pay the purchase price at the closing, which was to occur within 30 days after the July 31, 2018 expiration of the Inspection Period. The earnest money, which constituted 1.6% of the total purchase price, would be credited against the purchase price. While First Buyer did not pay the earnest money, interest on the earnest money would ordinarily be an adequate measure of damages to Seller for First Buyer's failure to pay the earnest money. *See Blenheim Homes, Inc.*, 119 Ohio App. at 48.

Section 2 of the 2018 Purchase Agreement, discussing the earnest money, does not state that a failure to timely make the deposit constitutes a breach or default, or relieves Seller from its obligations. At the time of that contract's execution, Section 2 did not include the name of First Buyer's counsel to act as the collective "Escrow Agent" with Mr. Galasso, and the signature for the "Escrow Agent" contains only Mr. Galasso's signature. First Buyer did not pay its earnest money deposit into escrow within the specified time because no account or joint escrow agents were established by the parties to allow First Buyer to do so. Although Mr. Galasso responded to Mr. Fox's June 2018 request for information to attempt to settle the details about the escrow account and agents, Mr. Galasso never responded to Ms. Kohnen's July 9, 2018 email attempting to

finalize those details. Seller neither requested further assurances from First Buyer regarding the earnest money, nor provided First Buyer with any notice of alleged breach or default on this issue. To the contrary, Seller repeatedly assured First Buyer that these two parties had the Property under contract. Although First Buyer breached that contract by not paying its earnest money deposit, that breach was immaterial, and First Buyer substantially performed under the contract. *See Blenheim Homes, Inc.*, 119 Ohio App. at 48; *Hansel*, 2002-Ohio-198, ¶ 12.

### iii. Seller materially breached by failing to offer First Buyer its ROFR

The ROFR provides:

If Seller agrees to sell the Property (whether by transfer of title to the Property or effectuating a transfer by forming an entity to hold title to the Property and transferring its ownership interests) to a third party before the expiration of the Inspection Period, Seller shall provide notice of the closing to First Buyer and First Buyer may purchase the Property upon the same terms and conditions as the third party buyer's, by wiring funds and closing on the same day that the third party buyer is scheduled to close.

. . .

Seller may terminate the 2018 Purchase Agreement at any time during the Inspection Period, by providing First Buyer with written notice of termination.

Neither party terminated the 2018 Purchase Agreement during the Inspection Period,  which expired on July 31, 2018. Seller agreed to sell the Property to Second Buyer when those parties executed the Second Buyer Contract on June 13, 2018. Seller materially breached the 2018 Purchase Agreement when it did not provide First Buyer notice of the Second Buyer Contract's existence and the start of the July 27, 2018 closing thereunder; and when Seller did not provide First Buyer with the opportunity to purchase the Property under the same terms and conditions as found in the Second Buyer Contract.

Seller's failure to provide these notices destroyed the purpose or value of the 2018 Purchase Agreement. *See Hansel*, 2002-Ohio-198, ¶ 12.

### iv.  Damages

As noted, the Court will issue a separate Opinion and Partial Order addressing the issue of the appropriate award of damages to First Buyer under the 2018 Purchase Agreement on a later date. For purposes of this Partial Order's conclusions of law regarding First Buyer's breach of contract claim, though, First Buyer has sufficiently established that it suffered damages in an amount to be determined.

### v.  Seller's actions constitute a breach of the implied duty of good faith and fair dealing

Ohio law imposes an implied duty[20] of good faith on parties to all contracts. *Ponder v. Bank of Am., N.A.*, No. 1:10-CV-00081, 2011 WL 8307207, at *6 (S.D. Ohio Mar. 8, 2011) (citing *Littlejohn v. Parrish*, 2005-Ohio-4850, ¶ 27, 163 Ohio App. 3d 456, 463, 839 N.E.2d 49, 50). The duty requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Littlejohn*, 2005-Ohio-4850, ¶ 26 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 205 cmt. a (1981)). Under the duty, "bad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 205 cmt. d). "[T]here is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-

---

[20] "[T]he duty does not create an independent basis for a cause of action." *Wendy's Intern., Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009). "[G]ood faith is part of a contract claim and does not stand alone." *Lakota Loc. Sch. Dist. Bd. of Edn. v. Brickner*, 108 Ohio App. 3d 637, 646, 671 N.E.2d 578, 584 (1996).

Ohio-15, ¶ 43, 152 Ohio St. 3d 453, 464, 97 N.E.3d 458, 469. The duty "requires not only honesty but also reasonableness in the enforcement of the contract." *Littlejohn*, 2005-Ohio-4850, ¶ 27.

Seller's concurrent negotiations with First Buyer through July 29, 2018 and withholding of notice under the ROFR constitutes unreasonable bad faith dealing in violation of Seller's duty under the 2018 Purchase Agreement. *See Lucarell*, 2018-Ohio-15, ¶ 43; *Littlejohn*, 2005-Ohio-4850, ¶ 27. The Court will order that, with respect to First Buyer's claims for breach of contract and breach of the implied duty of good faith and fair dealing, it finds **AGAINST** Seller and **IN FAVOR** of First Buyer. Additionally, and in light of these holdings, the Court need not discuss First Buyer's equitable estoppel claim. The Court will order that the equitable estoppel claim is **DISMISSED**.

### 2.  Second Buyer is a bona fide purchaser

In Ohio, a bona fide purchaser for value is a purchaser who takes property absent notice of any adverse claims, for valuable consideration, and in good faith. *Tonito's, Inc. v. S&J Ents., Inc.*, 2010-Ohio-776, ¶ 16. Whether a purchaser is a bona fide purchaser is determined at the time the purchase is consummated, or at the latest, at the time of payment. *Riser Foods Co. v. Shoregate Properties, LLC,* No. 1:09 CV 489, 2011 WL 3921850, at *6 (N.D. Ohio Sept. 7, 2011). The party seeking the status of a bona fide purchaser has the burden of proof on that issue. *Id.*

### i.  Second Buyer did not have notice of First Buyer's claim

Notice of adverse claims may be actual or constructive. *Tonito's, Inc.*, 2010-Ohio-776 at ¶ 17. A party will be deemed to have constructive notice of an adverse claim if that party has knowledge of facts that would induce a prudent person to make an inquiry by

which that party would have or could have obtained knowledge of the adverse claim. *Id.*; *accord Riser Foods Co.*, 2011 WL 3921850, at \*6 (quoting *Wayne Bldg. & Loan Co. of Wooster v. Yarborough*, 11 Ohio St. 2d 195, 202, 228 N.E.2d 841, 847 (1967)). "Ohio courts have consistently held that '[o]ne having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts he might have discovered by diligent inquiry. Whatever is notice enough to excite the attention of a prudent man and put him on his guard is notice of everything to which such inquiry might have led [.]'" *Tonito's, Inc.*, at ¶ 18 (quoting *Hightower v. Reiger*, No. 54447, 1988 WL 112525, at \*2 (Ohio Ct. App. Oct. 6, 1988)).

Second Buyer did not have actual notice of First Buyer's claim. Seller made the following representations and warranties to Second Buyer in the Second Buyer Contract: (1) no person, firm, corporation or other entity has any right or options to acquire the premises, any portion thereof or any interest therein; (2) at closing, Seller will transfer the Property to Second Buyer free and clear of any rights of first refusal and options; (3) the consummation of the transaction will not conflict with or result in a breach of any agreement to which Seller is a party seller; and (4) there are no purchase contracts, options, or any other agreements of any kind, oral or written, formal or informal, choate or inchoate, recorded or unrecorded, whereby any person or entity other than Seller will have acquired or will have any basis to assert any right, title, or interest in, or right to possession, use or enjoyment or proceeds of, any part or all of the Property. There was nothing indicating that the 2018 Purchase Agreement had been filed in either the Hamilton County Recorder's Office or Second Buyer's title report. Further, at no time did Seller, or any of its lawyers, advise Second Buyer about the existence of the 2018 Purchase

Agreement. Second Buyer first learned of the 2018 Purchase Agreement when the state court issued the TRO on August 7, 2018.

Second Buyer did not have constructive notice of First Buyer's claim. The Court understands that real estate developers often inform the community of potential plans which never come to fruition. Even assuming that the CBC Article contained facts which would put a prudent man on inquiry, though, Second Buyer's instructing Mr. Friedman to inquire into the statements made in the article was a diligent inquiry and reasonable course of action. *See Tonito's, Inc.*, at ¶ 18; *Hightower*, 1988 WL 112525, at *2. It was reasonable for Mr. Friedman, and Second Buyer, to rely on Mr. Simari's representations and their understanding of Seller's contractual representations and warranties. The Court further finds that backup offers are routine in commercial real estate transactions. In short, Second Buyer made a reasonable inquiry into the CBC Article's accuracy and reasonably relied on information, from its primary source of contact with Seller, that the article was inaccurate.

Second Buyer did not have notice as a matter of law of First Buyer's claim, and the structure of the transaction did not provide such notice. First Buyer argues that, because Seller was aware of the 2018 Purchase Agreement, and transferred the Property to CTA—which, at the time of the transfer, was controlled by Seller—Seller's knowledge of the 2018 Purchase Agreement was imputed to CTA, *i.e.*, Second Buyer, at the time of the transfer.

"[T]he doctrine of imputed notice to a [ ] principal rests upon the ground that the [ ] agent has knowledge of something, material to the particular transaction, which it is his duty to communicate to his principal." *Pitzer v. Littleton*, 2008-Ohio-5966, ¶ 16 (*American*

*Export & Inland Coal Corp. v. Matthew Addy Co.* (1925), 112 Ohio St. 186, 197, 147 N.E. 89). "The general rule is that notice to an agent, which acted for his principal, of facts affecting the character of the transaction, is constructive notice to the principal." *Id.* (citing *American Export & Inland Coal Corp.*, 112 Ohio St. at 198). An agent's knowledge is only imputed to his principal if and when that knowledge is obtained while he is acting with the scope of his authority and in reference to a matter over which his authority exceeds. *See Hallowell v. Cty. of Athens*, 2004-Ohio-4257, ¶ 11.

There is no indication that Seller was an agent acting on CTA's behalf when Seller obtained knowledge of the 2018 Purchase Agreement. Section 2(a) of the 2018 Purchase Agreement states, in part, that: Seller agrees to effectuate the conveyance of the Property to Purchaser, and Purchaser agrees to purchase the Property, through the acquisition of an Ohio limited liability company to be formed by Purchaser with Seller's involvement and consent, in which Seller will be the sole Member. First Buyer does not allege that CTA was formed for the purpose of the 2018 Purchase Agreement. Nor could First Buyer so argue, as CTA was formed in February 2018, before the 2018 Purchase Agreement's creation and execution. Section 2(a) of the 2018 Purchase Agreement does not refer to CTA such that Seller is an agent of CTA's. Moreover, there is no indication that Seller was acting on behalf of any other person or entity when it endeavored to sell the Property. In short, the imputed knowledge doctrine does not apply to impute Seller's knowledge of the 2018 Purchase Agreement to CTA. *See Hallowell*, 2004-Ohio-4257, ¶ 11.

### ii. Second Buyer paid value for the Property and acted in good faith

Section (2) of the Second Buyer Contract, titled "Purchase and Sale," provides that Seller agreed to sell, and Second Buyer agreed to purchase and accept the Property for

the $11M purchase price.[21] The settlement statement confirms that Second Buyer paid valuable consideration, $10.4M, for the Property. Ms. Kohnen explained that commercial real estate transactions in the area are routinely structured to include contribution deeds and membership interests to avoid certain Ohio transfer taxes. That the transaction's structure was more complex than a direct property transfer does not negate the fact that Second Buyer paid $10.4M for the Property.

Second Buyer purchased the Property in good faith, and the purchase was an arms-length transaction.

Second Buyer has met its burden of proof on the bona fide purchaser issue, *see Riser Foods Co.*, 2011 WL 3921850, at *6, and Second Buyer is a bona fide purchaser of the Property. Therefore, First Buyer is not entitled to specific performance. *See Morrison v. Bare*, 2007-Ohio-6788, ¶ 14 ("When property has been transferred to a bona fide purchaser, specific performance is not available."). In light of Second Buyer's status as a bona fide purchaser, and as First Buyer's specific performance claim fails, the Court finds that First Buyer's claim for injunctive relief also fails.

As the Court determines that Second Buyer is a bona fide purchaser, for the same reasons, the Court determines that Lender is a bona fide mortgagee.

To the extent that First Buyer's filing of its Complaint, and subsequent Amended Complaint, may constitute lis pendens under Ohio Revised Code § 2703.26 or § 5301.25, this Partial Order dismissed that Amended Complaint as it relates to First Buyer's ownership interest claims in the Property.

---

[21] The language of Section (2) in the Second Buyer Contract is nearly identical to that found in Section (2) of the 2018 Purchase Agreement save for the names of the specific to-be-formed Ohio LLCs.

First Buyer's filing of an Affidavit of Facts Relating to Title with the Hamilton County Recorder's Office, which is recorded at Book 13821, Page 01560, has clouded Second Buyer's title to the Property. As a result of the title cloud, Second Buyer has not developed the Property as planned. Mr. Unger testified that it would have been imprudent for him to invest millions of dollars into the Property over the past years if, in the end, First Buyer prevailed in its request to unwind the sale of the Property.

The Court will order that, with respect to First Buyer's claims for specific performance and injunctive relief, it finds **AGAINST** First Buyer and **IN FAVOR** of Second Buyer. The Court will also order that, immediately, and without delay, upon entry of this Opinion and Partial Order, First Buyer shall have the Affidavit of Facts Relating to Title, recorded with the Hamilton County Recorder's Office at Book 13821, Page 01560, removed and released.

### 3. Second Buyer did not tortiously interfere with the 2018 Purchase Agreement Contract

In Ohio, tortious interference with contract requires proof of the following elements: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Bridge v. Park Natl. Bank*, 2008-Ohio-6607, ¶ 13, 179 Ohio App. 3d 761, 766, 903 N.E.2d 702, 706 (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 1999-Ohio-260, 85 Ohio St. 3d 171, 171, 707 N.E.2d 853). For the reasons in the bona fide purchaser analysis above, which the Court need not repeat here, First Buyer fails to establish that Second Buyer knew of the 2018 Purchase Agreement. First Buyer's tortious interreference claim thus fails. The Court will order that, with respect to First Buyer's claim

for tortious interference with a contract, it finds **AGAINST** First Buyer and **IN FAVOR** of Second Buyer.

With respect to Second Buyer's and Lender's respective counter- and cross-claims, the Court finds **IN FAVOR** of Second Buyer and Lender on those claims to the extent that the Court will order that: Second Buyer is a bona fide purchaser; all of First Buyer's claims against Second Buyer fail; immediately, and without delay, upon entry of this Opinion and Partial Order, First Buyer shall have the Affidavit of Facts Relating to Title, recorded with the Hamilton County Recorder's Office at Book 13821, Page 01560, removed and released; judicial notice is taken of Judge Goering's April 13, 2021 Judgment and Order, particularly of his findings regarding the priority of Lender's interest in the Property; and the Court will not disturb the state court determinations. Further, specific performance and unwinding of the transfer are not proper remedies.

### 4.  The Ohio Uniform Fraudulent Transfer Act is Not Applicable

The Ohio Uniform Fraudulent Transfer Act ("Act") creates a right of action for a creditor to set aside an allegedly fraudulent transfer of assets. *Fade v. Morris*, 2015-Ohio-5337, ¶ 25 (quoting *Wooten v. Kreischer*, 162 Ohio App. 3d 534, 834 N.E.2d 35, 2005-Ohio-4078, ¶ 45 (5th Dist. 2005)); *accord* Ohio Rev. Code § 1336.04(A)(1). A plaintiff must have standing as a creditor and establish the following elements to state a viable claim under this Act: the transfer of an asset or the incurrence of a new debt; done with actual intent to defraud, hinder, or delay; and present or future creditors. *Id.* ¶¶ 25, 29.

Under the Act, the term "creditor" means "as a person who has a claim." Ohio Rev. Code Ann. § 1336.01(D). The term "debtor" means a person who is liable on a claim. *Id.* § 1336.01(F). The term "claim" means "right to payment, whether or not the right is

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 1336.01(C). While First Buyer has established a claim for breach of contract, based upon Seller's actions as discussed above, First Buyer has not established that it has standing to contest the transfer of the Property as a creditor, or that there was a creditor-debtor relationship between First Buyer and Seller, as those terms are defined under the Act. Accordingly, First Buyer does not state a viable claim against Seller under the Act. *See Fade*, 2015-Ohio-5337, ¶ 25. The Court will order that, with respect to First Buyer's claim for fraudulent transfer, it finds **AGAINST** First Buyer and **IN FAVOR** of Seller.

## III.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

1. Seller breached the 2018 Purchase Agreement's ROFR entitling First Buyer to damages.

    i. The Court finds **AGAINST** Seller and **IN FAVOR** of First Buyer with respect to First Buyer's claims for breach of contract and breach of implied duty of good faith and fair dealing.

    ii. A separate Opinion and Partial Order addressing the issue of the appropriate award of money damages will issue on a later date.

    iii. First Buyer's equitable estoppel claim is **DISMISSED**.

2. Second Buyer is a bona fide purchaser for value of the Property.

    i. The Court finds **AGAINST** First Buyer and **IN FAVOR** of Second Buyer with respect to all of First Buyer's claims against Second Buyer, *i.e.*, with respect to First Buyer's claims for specific

performance, injunctive relief, and tortious interference with a contract.

    ii. Immediately, and without delay, upon the entry of this Opinion and Partial Order, First Buyer shall have the Affidavit of Facts Relating to Title, recorded with the Hamilton County Recorder's Office at Book 13821, Page 01560, removed and released.

3. The Court finds **AGAINST** First Buyer and **IN FAVOR** of Seller with respect to First Buyer's claim for fraudulent transfer.

4. Judicial notice is taken of Judge Goering's April 13, 2021 Judgment and Order.

**IT IS SO ORDERED.**

_/s Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court